**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No.** |
| | ) | |
| v. | ) | |
| | ) | |
| **ONE GE CF6-50C2  AIRCRAFT ENGINE** | ) | |
| **WITH ENGINE SERIAL NO. 517738** | ) | |
| | ) | |
| **Defendants.** | ) | |

**COMES NOW**, the plaintiff United States of America, by and through the United States Attorney for the District of Columbia, to bring this verified complaint for forfeiture in a civil action *in rem* against the defendant property, which is one General Electric (GE) aircraft engine, engine serial number (ESN) 517738, currently located in the Republic of Turkey and subject to return to the U.S. Government under a Mutual Legal Assistance Treaty request.  In further support of its cause, plaintiff states as follows:

**I.      NATURE OF THE ACTION**

1.      This *in rem* forfeiture action arises out of an investigation by the Bureau of Industry & Security ("BIS"), Office of Export Enforcement ("OEE") of a scheme to illicitly procure sensitive products, items, and commodities from the United States, ultimately destined to Iran for the purpose of evading U.S. export controls and sanctions.  As a part of this scheme, the co-conspirators, identified below, used the U.S. financial system and the U.S. aircraft industry to further their scheme.  They employed sophisticated evasion techniques and front companies to disguise the true nature of their illicit business dealings, as well as to protect the on-going nature of the crime.

2.      For the reasons set forth in more detail below, the United States seeks the seizure and

forfeiture of the defendant property.  The defendant property is subject to seizure and forfeiture

pursuant to 18 U.S.C. §981(a)(1)(C), as property constituting or derived from proceeds traceable

to violations of a specified unlawful activity, that is, the International Emergency Economic

Powers Act ("IEEPA"), codified at 50 U.S.C. § 1701 *et seq.*  In addition, the defendant property

is subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), as property involved in

money laundering transactions and attempted money laundering transactions, in violation of 18

U.S.C. § 1956, and as an asset traceable to such property.

## II.     JURISDICTION AND VENUE

3.      This court has jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1355.  Pursuant to 28

U.S.C. § 1355, the act of Congress giving rise to forfeiture is 18 U.S.C. § 981(a).

4.      Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving

rise to the forfeiture took place in the District of Columbia.  The assets are currently subject to a

detention order issued by the Office of Export Enforcement under the authority in the Export

Administration Regulations (EAR), codified in 15 C.F.R. 758.7 ("Authority of the Office of

Export Enforcement, the Bureau of Industry and Security, Customs Offices and Postmasters in

clearing shipments.")

5.      In addition, the United States District Court for the District of Columbia court has

jurisdiction over the property pursuant to 28 U.S.C. § 1355(b)(2) because the asset is currently

located abroad, that is, in the Republic of Turkey.

### III.   STATUTORY AUTHORITIES

A.            The Export Administration Regulations

6.      The United States Department of Commerce has the authority to prohibit or curtail the export of goods and technologies from the United States to foreign countries, as necessary, to protect, among other things, the national security and foreign policy of the United States. The Department of Commerce implemented that authority through the Export Administration Regulations ("EAR" or "Regulations") (see below), which restricts the export of certain goods and technologies unless authorized by the Department of Commerce through issuance of a valid export license by its Bureau of Industry and Security. The EAR further prohibits any transaction designed to evade or avoid, or which has the purpose of evading or avoiding said regulations, including the making of false or misleading statements or concealing a material fact in the course of the submission of documents relating to an export of goods or technologies.

7.      The EAR, 15 C.F.R. 730.1, *et seq*., regulate the export of all "dual use" items, that is, items that have both a commercial application and a military or strategic use. *See* 15 C.F.R. 730.3. The EAR limit the export of goods and technology that could enhance foreign military capabilities, jeopardize U.S. national security, or undermine U.S. foreign policy goals. The EAR place requirements on exporters and includes a list of products, commodities and items for which an export license is required. *See* 15 C.F.R. § 744.

8.      Whether an item requires an export license depends in part on what country the item is being exported to, who the end-user of the item is, and what the end-user intends to use the item for. The EAR expressly requires a license applicant to disclose the names and addresses of all parties to a transaction, 15 C.F.R. § 748.4(b), including the applicant, purchaser, intermediate consignee(s) (if any), ultimate consignee, and end-user, 15 C.F.R. § 748.5. Certain applications

must be supported by documents designed to elicit information concerning the disposition of the items intended for export. *See* 15 C.F.R. § 748.9(b).

9.      Commodities that are "subject to the EAR" are defined in 15 C.F.R. 734.3(a)(1-4), which states that the phrase means  all items or commodities that are physically located in the United States, including a U.S. Foreign Trade Zone, or moving in-transit through the U.S. from one foreign country to another; all U.S.-origin items wherever located; and foreign manufactured commodities that incorporate more than a *de minimis* U.S.-origin parts or technology.  In this case, the defendant property is subject to the EAR by virtue of, among other reasons, the fact that the engine is U.S.-origin and has an Export Control Classification Number ("ECCN").

10.     The EAR's authorizing statute, the Export Administration Act of 1979 ("EAA"), codified at 50 U.S.C. App. 2401-2420, expired in August 1994, and was reauthorized by Public Law 106-508, signed on November 13, 2000.  The EAA lapsed again on August 20, 2001, but the Regulations have continued in full force and effect through periodic reauthorizations and successive invocations of the IEEPA.  On August 17, 2001, President George W. Bush issued Executive Order ("EO") 13222, in which he ordered that all provisions of the EAR "remain in full force and effect" under the IEEPA authority.  EO 13222 has been extended by successive Presidential Notices.  On August 7, 2015, President Barack Obama signed the Updated Notice of Continuation of the EAA.

11.     To violate, attempt to violate, or conspire to violate any portion of the EAR is a felony punishable by up to 20 years' imprisonment under IEEPA.  See 50 U.S.C. § 1705.  The EAR makes it unlawful to engage in any conduct prohibited by, or contrary to, or refrain from engaging in any conduct required by, the EAR.  It is also unlawful to violate any order, license or authorization issued thereunder; to cause, aid, abet, solicit, attempt, or conspire to commit a

violation of the EAR, or any order, license, or authorization issued thereunder.  The EAR

prohibits the ordering, buying, removing, concealing, storing, use, sale, loan, disposition,

transfer, transport, financing, forwarding, or other servicing, in whole or in part, of any item

exported or to be exported from the United States, that is subject to the EAR, with knowledge

that a violation of the EAR, or any order, license, or authorization issues thereunder, has

occurred.  *See* 15 C.F.R. § 764.2(a)-(e).

12.     Finally, the EAR makes it unlawful to engage in any transaction or take any other action

with intent to evade the provisions of the EAR, or any order, license, or authorization issued

thereunder.  Id. 764.2(h).

B.          The IEEPA

13.     This civil forfeiture action relates to violations of the Regulations and Executive Orders

issued pursuant to the IEEPA, codified at 50 U.S.C. § 1701 *et seq.*  The IEEPA gives the

President certain powers, defined in § 1702, to deal with any threats with respect to which the

President has declared a national emergency, and prescribes criminal penalties for violations

thereunder.  *See* 50 U.S.C. § 1705(a).

C.          Title 18, United States Code, Section 554

14.     Additionally, 18 U.S.C. § 554, makes it unlawful to export or attempt to export or

smuggle from the United States "any merchandise, article, or object contrary to any law or

regulation of the United States . . . ."  Violations of the EAR and IEEPA serve as predicate acts

for a 18 U.S.C. § 554 violation.

D.          BIS Temporary Denial Orders

15.     A Temporary Denial Order (TDO) is an administrative order issued under the authorities

of the EAR (15 C.F.R. 766.24) signed by the Assistant Secretary of Commerce for Export

Enforcement "temporarily denying export privileges when such an order is necessary in the public interest to prevent the occurrence of an imminent violation." 15 C.F.R. 764.6(c)

16.     As defined in 15 C.F.R. 766.24, "a violation may be 'imminent' either in time or degree of likelihood." To indicate the likelihood of future violations, BIS may show that the violations are "…significant, deliberate, covert and/or likely to occur again, rather than technical or negligent…" The TDO is a public document and gives notice to companies in the United States and abroad to "cease dealing with the [named respondents of the TDO] in U.S.-origin items…" 15 C.F.R. 766.24(b)(3)

17.     A "related person" may be added to the TDO as well "in order to prevent evasion [of the TDO] . . . ." 15 C.F.R. 766.23(a). The related person is not the respondent to the TDO, but the terms of the TDO are made applicable to them because they are "related to the respondent by ownership, control, position of responsibility, affiliation, or other connection in the conduct of the trade or business." 15 C.F.R. 766.23(a)

E.                      Iranian Transactions and Sanctions Regulations

18.     On March 15, 1995, the President issued Executive Order ("EO") No. 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" and declaring "a national emergency to deal with that threat." EO 12957, which was expanded and continued by EO's 12959 and 13059, was in effect at all times relevant to this complaint. These EO's imposed economic sanctions, including a trade embargo, on Iran and prohibited, among other things, the exportation, re-exportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person. They also prohibited any transaction by any United States person or within the

United States that evaded or avoided, or had the purpose of evading or avoiding, any prohibition set forth in the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations ("ITR"), 31 C.F.R. Part 560, implementing the sanctions imposed by the Executive Orders. In October 2012, the ITR was renamed, and without substantive changes, republished as the Iranian Transactions and Sanctions Regulations or "ITSR."

19.     The ITSR prohibited, among other things, the export, re-export, sale, or supply, directly or indirectly, of any goods, technology, or services from the United States or by a United States person, wherever located, to Iran or the Government of Iran, without prior authorization or license from the United States Department of the Treasury, through Office of Foreign Asset Control (OFAC). These regulations further prohibited any transactions that evade or avoid or have the purpose of evading or avoiding any of the prohibitions contained in the ITSR, including the unauthorized exportation of goods from the United States to a third country if the goods are intended or destined for Iran. *See* 15 C.F.R. §§ 560.201, 560.203, 560.204, 560.205, and 560.206.

20.     As part of its enforcement efforts, OFAC publishes a list of individuals and companies owned or controlled by, or acting for or on behalf of, targeted countries. It also lists individuals, groups, and entities, such as terrorists and narcotics traffickers designated under programs that are not country-specific. Collectively, such individuals and companies are called "Specially Designated Nationals." Their assets are blocked and U.S. persons are generally prohibited from dealing with them. Criminal violations of the ITSR are enumerated by the criminal penalty statutes of IEEPA, 50 U.S.C. §§ 1701-1705. The EO's and the ITSR were in effect at all times relevant to this complaint.

F.        Money Laundering Statutes

21.       Title 18 U.S.C. § 1956(h) criminalizes a conspiracy to violate § 1956 or 1957.

22.       Pursuant to 18 U.S.C. § 1956(c)(7)(D), the term "specified unlawful activity," includes a violation of IEEPA, the EAR, and 18 U.S.C. § 554(a)

23.       Title 18 U.S.C. § 1956(a)(2)(A) (the international *promotional* money laundering statute) criminalizes transporting, transmitting, and transferring, and attempting to transport, transmit, and transfer a monetary instrument or funds, inter alia, to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity.

24.       Title 18 U.S.C. § 1956(a)(2)(B)(i) (the international *concealment* money laundering statute) criminalizes transporting, transmitting, and transferring, and attempting to transport, transmit, and transfer a monetary instrument or funds, inter alia, to a place in the United States from or through a place outside the United States knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

## IV.        FACTS GIVING RISE TO FORFEITURE

A.        Overview

25.       This civil forfeiture action relates to one aircraft jet engine, ESN 517738, that is subject to a detention order issued by the OEE pursuant to the EAR.  Following a notice by the U.S. Department of State, at OEE's request, to prevent the engine from reaching Iran, the Republic of Turkey asked the U.S. Government for a Mutual Legal Assistance Treaty ("MLAT") request.

The MLAT was transmitted to the Government of the Republic of Turkey through the U.S. Department of Justice, Office of International Affairs on or about April 29, 2013 and included a request to prevent the onward movement of the engine from Turkey to Iran and to return the defendant property to the U.S.

26.     The engine was being re-exported by Kral Aviation of Istanbul, Turkey ("Kral"), to Mahan Air of Tehran, Iran. The engine is currently being held at an aircraft maintenance repair company in Istanbul, Turkey. The Government of Turkey has identified and verified the location of the defendant property and has requested this civil forfeiture action to commence foreign restraint and confiscation of the defendant property.

27.     Kral is a firm that purchases and sells civil aviation parts and components. Kral has never received approval for an export license from BIS. Between March 2011 and July 2012, Kral imported at least 42 shipments of U.S.-origin aircraft parts valued at over $2.1 million, some of which required a BIS license.

28.     During the course of its investigation, OEE developed evidence that Kral supplied many of these U.S.-origin parts to Mahan Air of Iran.

B.          Mahan Air TDO and U.S. Government Sanctions

29.     Mahan Air is an Iranian airline located at Mahan Tower, No. 21, Zaadegan Street, M.A. Jenah Expressway, Tehran, Iran. Mahan Air, its officers, affiliates, aircraft, and Mahan Air-controlled front companies around the world have been sanctioned by OFAC. Pursuant to Executive Order 13224, OFAC listed Mahan Air as a Specially Designated Global Terrorist ("SDGT") in October 2011 because Mahan Air provided financial, material, and technological support to the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF).

30.     Mahan Air has facilitated IRGC-QF shipments of arms and weapons to Hizballah, a group based in Syria and Lebanon, also designated by Treasury as a Foreign Terrorist Organization.

31.     Mahan Air is also subject to a TDO issued by the Assistant Secretary of Commerce for Export Enforcement.  The initial TDO was signed on March 17, 2008.  The TDO was renewed subsequently in 2009, 2010, 2011, 2012, 2013, 2014 and most recently on July 13, 2015.

32.     The TDO prohibits Mahan Air and its related parties, including those "acting for or on their behalf, any successors or assigns, agents, or employees" from "directly or indirectly, participat[ing] in any way in any transaction involving any commodity, software or technology . . . exported or to be exported from the United States that is subject to the Export Administration Regulations . . . ." *See* BIS TDO Renewal Order, Mahan Air, et al., July 13, 2015, at IV.

33.     OEE has obtained evidence of a significant business relationship between Kral and Mahan Air.  Over the course of their business association, Kral has supplied U.S.-origin aviation parts to Mahan Air, in violation of multiple statutes and the EAR.  Mahan Air used its relationship with Kral to conceal the fact that many of Kral's purchases of U.S.-origin aviation equipment were re-exported to Iran.  Kral made false representations to the U.S. exporters at the time of purchase, claiming that its shipments would remain in Turkey, when in reality they were re-exported to Iran.

C.      Kral's Previous Attempt to Get a BIS License and Assertion of Iranian Representation

34.     In or about March 2012, Kral attempted to obtain controlled U.S.-origin civil aviation parts.  A U.S. export company notified Kral that a BIS license was required.  The U.S. company then applied for such license.  After BIS raised concerns regarding the intended end-user of the parts, Kral notified the U.S. company that Kral was cancelling the order.

35.     On April 22, 2011, another U.S. export company disclosed to OFAC that Kral had admitted to the company that Kral was a supplier for Iranian aircraft. The U.S. company understood Kral to be a Turkish extension of Zagros Airlines ("Zagros").

36.     Zagros is an Iranian airline company. On August 15, 2011, pursuant to the EAR, Zagros was added to the BIS Entity List. *See* 76 Fed. Register 50408. Inclusion on the BIS Entity List triggers heightened export license requirements. There is a presumption of denial for all license applications where Zagros is a party to the transaction. *See* 15 C.F.R. § 744.11(a).

D.          Related Civil Forfeiture Actions

37.     The United States Attorney's Office for the District of Columbia filed a related civil forfeiture action against three pieces of aviation equipment identified as Inertial Reference Units (IRUs) in November 2013. The complaint alleged that Kral attempted to export the defendant IRUs to Turkey without obtaining the requisite licenses. During the course of its investigation, law enforcement learned that these IRUs were destined for Iran. The government alleged that the purchase of these IRUs was in some part for the benefit Mahan.

38.     As no claims were filed, the Government moved for default judgment, and an Order of Forfeiture was issued by United States District Judge Christopher R. Cooper on May 15, 2014. *See United States of America v. Three Inertial Reference Units Part Number 461800-03002203, with serial numbers 0451, 0116, and 0127*, D.D.C. Docket Number 1:13-cv-01751-CRC.

39.     The United States Attorney's Office for the District of Columbia filed a second related civil forfeiture action against a similar aircraft jet engine bearing ESN 517621 in August 2014. The complaint alleged that Kral attempted to export the defendant engine to Iran, specifically Mahan Air, without obtaining the requisite licenses and in violation of U.S. law. During the course of its investigation, law enforcement learned that this engine was destined for Iran based

on a reliable source of information that indicated that Mahan Air officials had negotiated, directed, and otherwise participated substantially in the attempted export of that asset, in violation of U.S. law.  As no claims were filed, the Government moved for default judgment, and an Order of Forfeiture was issued by the Honorable Judge Christopher R. Cooper on June 1, 2015.  (*See United States of America v. One CF6-50C2 Aircraft Engine, With Engine Serial No. 517621,* D.D.C. Docket Number 1:14-cv-01438-CRC).

E.        Evidence of Kral's Relationships with Iran & Mahan Air

40.      During the course of its investigation of transshipment and diversion of U.S.-origin aircraft products to Iran, OEE learned through a source of information, that has proven to be reliable, that Kral was involved in the procurement, acquisition, and re-export of U.S.-origin products on behalf of Mahan Air and other prohibited parties in Iran.

41.      Kral, by and through its officers, managers, and employees, have a long history of obtaining U.S.-origin commodities, including those purchased from the United States, and immediately re-exporting them from Turkey to Iran without the required license.  In addition, Kral has repeatedly made false statements, by omission and commission, to U.S. companies and law enforcement authorities in Turkey about the intended end-users, namely several prohibited parties and companies, as well as the intended destination, namely Iran.  These false statements constitute violations of U.S. law and export regulations.

42.      Among other details, the source of information revealed that between February 2012 and October 2012, Kral received approximately $393,000 from Mahan Air as payment for purchases made by Kral on Mahan Air's behalf.

43.      According to information obtained in the course of this investigation, Kral is owned by a Turkish national but actually controlled (through a power of attorney) by two Iranian brothers,

Peyman Amiri Larijani ("Peyman") and Toufan Amiri Larijani ("Toufan").  Toufan holds an Iranian passport and is listed as the General Manager of Kral.  Peyman also holds an Iranian passport and is listed as the Operations Manager of Kral.  Peyman has also contacted several U.S. businesses on Kral's behalf seeking to purchase U.S.-origin aircraft items.  Peyman's name also appears on a number of documents prepared in the ordinary course of business, including invoices, purchase orders, and other documents.

44.     In a sworn statement given to Turkish law enforcement on or about August 15, 2013, Toufan was asked "whether he had information on the outcome of" several aircraft engines, including the defendant property.  Toufan acknowledged that there was an export of an aircraft engine to Iran, although he maintained that there were no other transactions besides that one. Toufan did not further elaborate or give the ESN of the engine that Kral transshipped to Iran.

45.     However, it is clear from the evidence provided by the Turkish Government, and from evidence obtained by OEE that Kral facilitated the trade of many parts and aircraft engines to or from Iran.

46.     In fact, a list of Turkish exports from Kral to Iran lists at least 25 instances of goods exported by Kral between October 31, 2011 and September 18, 2012.  The value of these goods is over $607,000.  At least eight of the transactions occurred for the benefit of Mahan Air.  The Turkish customs documents identify six of these eight Mahan transactions as originating from the United States.  These transactions are valued at approximately $235,900, which accounts for nearly 40% of the total dollar value of Kral's exports to Turkey.

47.     In December 2013, Kral and its Turkish affiliate, Kral Havacilik, were each added to the BIS Entity List.  The Federal Register notice specifically noted that "[Kral and others added] …have engaged in the development and operation of an illicit aviation procurement network

designed to evade the U.S. Government's sanctions against Iran. The aggressive procurement scheme implemented by these persons has directly supported the operation of Mahan Airlines within Iran and throughout the world." *See* 78 FR 75458 (Dec. 12, 2013)

48.     The BIS Entity List, promulgated under 15 C.F.R. 744, required a license be obtained for any U.S.-origin commodity subject to the EAR that was destined to Kral.  The license requirement applied to any transaction in which U.S.-origin items were to be exported, re-exported, or transferred to Kral, where Kral was acting as the purchaser, intermediate consignee, ultimate consignee, or end-user.  Because of the finding that Kral was "acting contrary to the national security or foreign policy interests of the United States," any license application involving Kral was subject to a stated policy of "likelihood of denial," and thus would not have been granted.  In addition, no EAR license exceptions were available for exports, re-exports, or transfers to persons on the Entity List.

F.          ESN 517738 Transaction Summary

49.     The defendant property is a U.S. manufactured General Electric CF6-50C2 aircraft jet engine with the ESN 517738.  The financial transaction involving the defendant property is complex and involves multiple entities, some of which are shell companies.

50.     The defendant property is presently nominally owned by Adaero International Trade, LLC ("Adaero") of Rockford, Illinois.  Adaero is owned by Recep Sadettin Ilgin ("Ilgin"), a Turkish citizen who resides in Turkey, but has several business interests in the United States.  In April 2012, Ilgin had leased the defendant property to a small regional Turkish carrier for use "on-wing" on one of the Turkish carrier's airplanes.  However, Ilgin was concerned about the deteriorating financial condition of the Turkish carrier and thus was seeking to sell the defendant

property outright to an interested buyer, which was less of a risk than trying to collect rent from an "on-wing" operating aircraft.

51.     During the period between April and July 2012, Ilgin was approached by Kral to purchase the defendant property for $850,000. On July 4, 2012, a Letter of Intent for the defendant property was signed by Kral's General Manager, Toufan. Purportedly, Kral was purchasing the engine on behalf of Asian Aviation Logistics (AAL).

52.     On July 4, 2012, Kral Aviation issued quotation number MA8330 to Mahan Air Technical Logistics Director G. Zarei for the engine, with a price of $1,100,000. The quotation was prepared by Peyman Amiri Larijani. Attached to the quotation is a document named "Kral's new Bank Account details" and lists nine different accounts at three financial institutions: IS Bankasi, Ziraat Banksi [sic] and Bank Mellat.

53.     On or about July 4, 2012, Kral made a deposit of $50,000 as a down payment for the engines into Ilgin's business bank account in Turkey.

54.     On July 7, 2012, Kral Aviation re-issued the same quotation number MA8330 to AAL of Thailand. The quotation was for defendant property, and listed the same price of $1,100,000. The quotation was prepared by Peyman.

55.     Kral knew, or had reason to know, that AAL was a company frequently utilized as a "cut-out" or nominee for Mahan. Although Kral was in close and frequent communication with Mahan Air officials about the purchase, all official documents listed AAL as the counter party. AAL was the straw purchaser for Mahan. Based on the OEE investigation to date, Mahan was the primary, if not sole, beneficiary of the items purchased by AAL. Subsequently, AAL was also added to the BIS Entity List and later was also added to the OFAC SDN List.

-15-

G.        Discussions between Kral and Mahan

56.    OEE obtained information from a reliable source that on June 21, 2012, Javad Rajabi, who

is a Kral employee, corresponded with G. Zarei of Mahan Air, and Kral employees regarding

"CF6-50 and CF6-80." The correspondence included discussions about a meeting at Mahan

Tower I, in which there were discussions about CF6-50 ESN including 517738.

57.    OEE further obtained information from a reliable source that on June 28, 2012, Zarei

discussed the technical requirements of ESN 695311, another engine under discussion. In follow

up discussion, Rajabi thanked Zarei for his reply regarding this engine. Zarei noted that one of

the accounts in Istanbul was already blocked and that they had encountered difficulties with the

United States. Kral and Mahan employees were involved in these discussions.

58.    Mehdi Bahrami is a Mahan Vice-President, whose relationship with Mahan is believed to

date back to 1997. Bahrami has served as the head of Mahan's Istanbul office. Bahrami was

added to the Mahan TDO as a related person on February 4, 2013.

59.    On July 4, 2012, Bahrami received a Purchase Order on AAL letterhead from another

Mahan employee with the subject: "Quotation# MA8330 Engine ESN

517738/PO#AALGN282." The purchase order is dated July 4, 2012, the purchase order number

is AALGN-282, and the description is: CF6-50C2 ESN: 517738 valued at $1,100,000. This is

consistent with the ESN and value of the defendant property. The vendor is listed as Kral and

the ship to address is AAL in Bangkok, Thailand. The vendor point of contact is listed as

Peyman Amiri L., believed to be Peyman Amiri Larijani of Kral.

60.    OEE also obtained information from a reliable source that on July 9, 2012, Rajabi discussed

a corrected quotation for the defendant property to Mahan executives. The corrected quotation,

on Kral letterhead, contained the MA8330 number and was dated July 4, 2012, but listed AAL as

the purchaser, instead of Mahan. The salesperson was identified as "PAL;" the commodity was identified as one Engine CF6-50 ESN: 517-738, unit price of $1,100,000; and noted a deposit request of $50.000. This quotation was prepared by Peyman Amiri Larijani.

61.     OEE obtained information from a reliable source that on or about July 12, 2012, Mahan and Kral employees discussed an inspection report for the defendant property, which was ultimately forwarded among the group.

62.     OEE further obtained information from a reliable source that between July 19 and 24, 2012, Kral and Mahan employees discussed the readiness of several engines for shipment from the United States, including the defendant property.

63.     OEE also obtained information from a reliable source that on July 28, 2012 Kral and Mahan employees discussed the U.S. Department of Commerce's detention order issued against one of the Kral engines. Kral warned Mahan that Mahan's action would put Kral on the "Black List."

64.     On August 17, 2012, Ilgin sent a letter to Kral on Adaero letterhead stating that Adaero had been informed by Turkish Customs that the engine could not be exported from Turkey. The letter also stated that Kral had not fulfilled the payment obligations in the July 4, 2012 Letter of Intent. Since Adaero had not received payment of the remaining balance, it cancelled the sale of the defendant property.

H.          Kral's Knowledge of Export Restrictions to Iran

65.     On or about July 19, 2012, Kral and a U.S. Company executed an engine sale agreement for a similar engine to the defendant property, identified as ESN 517621. The agreement contained clauses that included a definition of "SDN Lists" and a warranty by Kral that it did not represent or was otherwise acting or, for, or behalf of, a prohibited party. Based on the evidence above, including the use of AAL as a front company, Kral purposefully concealed Mahan's

involvement in the procurement of the defendant property, because Kral was aware of the illegality of Mahan's involvement.

## V.   COUNT ONE

66.     The statements made in the above paragraphs are restated as if fully set forth herein.

67.     The defendant property was used to promote a conspiracy to violate the IEEPA, specifically, 50 U.S.C. § 1705, which makes it a crime to willfully attempt to commit, conspire to commit, or aid and abet in the commission of any violation of the EAR.

68.     As such, the defendant property is subject to forfeiture to the United States, pursuant to 18 U.S.C.  § 981(a)(1)(C), as any property which constitutes or is derived from proceeds traceable to a conspiracy to violate the IEEPA.

## VI.   COUNT TWO

69.     The statements made in the above paragraphs are restated as if fully set forth herein.

70.     Persons in Turkey, as well as Iran, conspired to transmit and transfer payments for the defendant property to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of the conspiracy to violate the IEEPA, EAR, and 18 U.S.C.  § 554, in violation of 18 U.S.C. §§ 1956(h) and (a)(2)(A).

71.     As such, the defendant property is subject to forfeiture to the United States, pursuant to 18 U.S.C. § 981(a)(1)(A), as property involved in transactions in violation of 18 U.S.C. § 1956(h), or as any property traceable to such property.

## VII.   CONCLUSION

**WHEREFORE**, the United States of America prays that a warrant for arrest *in rem* and notice issue to the defendant property as described above; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring that the defendant property be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted,

CHANNING D. PHILLIPS
United States Attorney

*/s/ Zia M. Faruqui*
Zia M. Faruqui,
D.C. Bar No. 494990
Assistant United States Attorney
555 4th Street, N.W., Fourth Floor
Washington, D.C.  20530
zia.faruqui@usdoj.gov
(202) 252-7117

## **VERIFICATION**

I, William Moulds, a Special Agent with the OEE, United States Department of Commerce,

Bureau of Industry and Security, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746,

that the foregoing Verified Complaint for Forfeiture *In Rem* is based upon reports and

information known to me and/or furnished to me by other law enforcement agents and that

everything represented herein is true and correct.

Executed on this __14th__ day of December, 2015.


*/s/ William Moulds*
William Moulds
Special Agent
Office of Export Enforcement